**E-FILED on ___9/11/07___**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE LEVI STRAUSS & CO. SECURITIES LITIGATION. | No. C-03-05605 RMW |
| | ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT |
| This Document Relates to: | **[Re Docket Nos. 64, 65]** |
| ALL ACTIONS. | |

Defendants Levi Strauss & Co. ("Levi"), Philip Marineau, William Chiasson, Gary Grellman, Peter E. Haas, Sr., Robert Haas, Angela Glover Blackwell, Robert Friedman, James Gaither, Peter Haas, Jr., Walter Haas, F. Warren Hellman, Patricia Salas Pineda, T. Gary Rogers, G. Craig Sullivan, Tully Friedman and Peter Georgescu ("individual defendants")[1] move to dismiss plaintiffs' consolidated amended complaint ("CAC"). Lead plaintiffs General Retirement System of the City of Detroit ("Detroit General"), the Policemen and Firemen Retirement System of the City of Detroit ("Detroit P&F"), and Metzler Investment GmbH ("Metzler") filed claims under §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"), and §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). The court has reviewed the moving and responding papers and considered the arguments of counsel. For the reasons set forth below, the

---

[1]      For purposes of this motion, unless otherwise specified "Levi" refers to both Levi and the individual defendants.

court (1) DENIES defendants' motion to dismiss plaintiffs' § 11 claims as to those plaintiffs who purchased Levi registered bonds in the after market traceable to the April 2001 or June 2003 registration statements, (2) DENIES defendants' motion to dismiss plaintiffs' § 15 claims, and (3) GRANTS defendants' motion to dismiss as to plaintiffs' other claims with twenty days' leave to amend.

## I. BACKGROUND

Levi is a privately-held company, but it files financial statements and other reports with the U.S. Securities and Exchange Commission ("SEC") in connection with bonds which are publicly-traded.  CAC ¶ 18.  Plaintiffs seek to bring this action on behalf of themselves and

> (i) all persons and entities who purchased or otherwise acquired Levi 11-5/8% and 12-1/4% registered bonds pursuant or traceable to the April 2001 Offering Documents and the June 2003 Offering Documents, respectively, and who were damaged thereby; and (ii) all persons and entities who purchased Levi 11-5/8%, 12-1/4% and 7% registered bonds in the open market between January 10, 2001 and October 9, 2003, and who were damaged thereby.

*Id.* ¶ 36.

### A.    Registered Bond Offerings

On January 11, 2001 Levi issued $380 million dollar-denominated 11-5/8% notes and €125 million euro-denominated 11-5/8% notes in a private offering.  On March 8, 2001 Levi filed a registration statement and prospectus for a proposed exchange offering in which holders of these private notes could exchange their notes for publicly-traded notes which would then be freely tradeable without further registration.  *Id.* ¶¶ 3, 65.  On April 6, 2001 Levi completed the exchange offering in which the private notes were exchanged for equal amounts of dollar-denominated and euro-denominated 11-5/8% registered notes due 2008 ("April 2001 Offering").  *Id.* ¶¶ 3, 64.  The registration statement filed in connection with the April 2001 Offering included Levi's income statements for fiscal years 1996 through 2000 and Levi's balance sheets for the fiscal years ended November 28, 1999 and November 26, 2000.  *Id.* ¶¶ 66-67.

On December 4, 2002, January 22, 2003, and January 23, 2003 Levi issued 12-1/4% notes in three private sales totaling $575 million.  On April 28, 2003 Levi filed a registration statement and prospectus for a proposed exchange offering in which holders of these private notes could exchange

their notes for publicly-traded notes which would then be freely tradeable without further registration. *Id.* ¶¶ 3, 69-72.  On June 16, 2003 Levi completed the exchange offering in which the private notes were exchanged for equal amounts of 12-1/4% registered notes due 2012 ("June 2003 Offering). *Id.* ¶ 3.  The registration statement filed in connection with the June 2003 Offering included Levi's income statements for fiscal years 1998 through 2002 and Levi's balance sheets for the fiscal years ended November 25, 2001 and November 24, 2002. *Id.* ¶¶ 69-72.

Plaintiffs' Securities Act claims (pursuant to §§ 11, 12(a)(2) and 15) are based on assertions that the registration statements and prospectuses filed in connection with the registered bond offerings in April 2001 and June 2003 contained false and misleading financial statements.  In addition to their Securities Act claims, plaintiffs also allege claims pursuant to § 10(b) of the Securities Exchange Act and regulation 10b-5 promulgated by the Securities and Exchange Commission ("SEC") thereunder for purportedly false and misleading financial statements issued during the class period.

### B. Alleged Improper Accounting

Plaintiffs aver that Levi's financials included in its registration statements were misstated because six categories of tax accounting were improper.

### 1. Excess Tax Reserves

On April 15, 2003 an article in the San Francisco Chronicle reported that two of Levi's former employees, Thomas Walsh ("Walsh") and Robert Schmidt ("Schmidt") were suing Levi alleging improper accounting practices. *Id.* ¶ 5.  That same day, Levi issued a press release denying any improper accounting practices and stating that its financial statements were accurate. *Id.* ¶ 6. On April 28, 2003 Levi announced that it was initiating a more widespread investigation of its accounting practices. *Id.* ¶ 6.

On September 15, 2003 Levi issued a press release announcing that between 1994 and 2001 it had established, maintained and released varying amounts of tax reserves that were unrelated to specific tax exposures and were unsupported by "sufficient contemporaneous documentation."  In its 2003 Form 10-K, Levi states that on September 15, 2003 "our Audit Committee had completed its investigation of the tax and related accounting issues raised in the wrongful termination suit.  The

1    Audit Committee concluded that our tax and related accounting positions were reasonable and

2    legally defensible and noted that in the course of its investigation it did not discover evidence of tax

3    or other fraud." Defs.' RJN, Ex. 1 at 18.  According to plaintiffs, Levi improperly released excess

4    reserves of $65 million in 1996, $18 million in 1998, $5 million in 1999, and $12 million in 2000.

5    *Id.* ¶ 45.

6                    **2.      Unrealizable Foreign Tax Credits**

7         Plaintiffs allege that Levi improperly recorded unrealizable foreign tax credits as deferred tax

8    assets without corresponding valuation allowances "throughout 1994 and 2002." *Id.* ¶ 46.  Plaintiffs

9    claim that although Levi has foreign tax credits that typically could be applied as tax credits against

10   United States tax on foreign income, Levi effectively cannot ever take such credits.  In particular,

11   plaintiffs assert that under Levi's operating structure Levi generates essentially all of its foreign

12   source revenue in jurisdictions where the marginal tax rate is higher than the United States tax rate.

13   *Id.* ¶ 49.  In tax years where the foreign jurisdiction marginal tax rate is higher than the domestic tax

14   rate, the Internal Revenue Service ("IRS") bars the use of the tax credits, although such credits may

15   be carried forward until used or expired.  If carried forward for future tax periods, tax credits are

16   reflected as deferred tax assets on the balance sheet.  *See generally* Statement of Financial

17   Accounting Standards ("SFAS") No. 109.  Plaintiffs claim that Levi should have created a valuation

18   allowance against the deferred foreign tax credits on its balance sheets to properly reflect that it

19   would not be able to take such credits against taxable income in future years.  Because Levi failed to

20   do so, plaintiffs contend, it overstated the assets on its balance sheet (and therefore, its net worth)

21   "throughout 1994 and 2002." CAC ¶¶ 46-53.  In 2003 Levi disclosed in its Form 10-K that it

22   increased its valuation allowance for foreign tax credits, domestic net operating loss carryforwards,

23   and alternative minimum tax credits from $32.7 million to $349 million because of unrealizable

24   credits.  *Id.* ¶ 53.

25                   **3.      Improperly Claimed Tax Deductions**

26        Plaintiffs claim that Levi improperly claimed tax deductions on its income tax returns for bad

27   debt and worthless stock in 1997, 1998, and 1999.  *Id.* ¶¶ 42, 56-60.  Plaintiffs appear to allege that

28   Levi took an investment loss deduction in its tax return for subsidiaries classified as branches, which

ORDER GRANTING IN PART AND DENYING IN PART  MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
C-03-05605 RMW
TNL/SPT                                    4

is purportedly improper because there was no "specific triggering event" that could permit such a deduction. *Id.* ¶ 57.  Plaintiffs also allege that Levi improperly took tax deductions for intercompany loans to its branches without meeting the criteria that there be a conclusion that there is no reasonable possibility that the subsidiary will be able to repay the loan. *Id.* ¶ 59-60.  As a result of these improper deductions, Levi deducted at least $200 million in its tax return resulting in the understatement of tax expense on its income statements in 1997 to 1999 by $70 million. *Id.* ¶ 60.

### 4.    Gain on Liabilities Transferred to Foreign Subsidiary

Plaintiffs claim that defendants set up a "special purpose entity" called "Finserv" to improperly repatriate income. *Id.* ¶ 55.  Plaintiffs allege that Levi reclassified Finserv to be a wholly-owned subsidiary of another Levi subsidiary, Levi Strauss Europe, in 1999.  Plaintiffs allege that, at that time, Levi improperly also transferred more than $200 million in hedging contracts with a net liability balance from Levi Strauss Europe to Finserv.  According to plaintiffs, this transfer should have resulted in a taxable gain under IRC § 357(c) but, since Levi did not record any tax gain from the transfer, it improperly overstated income tax expense by over $77 million in 1999. *Id.* ¶ 62.

### 5.    Tax Deduction

On October 10, 2003 Levi restated its fiscal 2001 financial results because it had improperly taken a tax deduction twice for losses related to closures of various manufacturing plants. *Id.* ¶ 43. As a result, Levi also restated its financials for the third quarter of 2003 for this same transaction. *Id.* With respect to this restatement, Levi's auditors, KPMG, issued a report identifying material weaknesses in Levi's internal accounting controls for detecting and preventing accounting misstatements. *Id.*  Specifically, KPMG issued the report because Levi had chosen to reflect the error as a change in estimate in the third quarter of 2003 rather than a restatement of 2001 results. *Id.* ¶ 179.  KPMG advised Levi that its global controller's group, corporate controller, and CFO needed to increase their involvement in the review and disclosure of tax items as they relate to GAAP and to appoint individuals in the tax department and controller's group with sufficient expertise in tax GAAP issues.  ¶ 179-80.  In December 2003, Levi replaced its senior vice president and chief financial officer ("CFO"), defendant William Chiasson ("Chiasson"). *Id.* ¶ 8.

**6.     Increase in Tax Valuation Account**

On March 1, 2004 Levi reported restated financial results for 2001, 2002, and the first two quarters of 2003. *Id.* ¶¶ 42, 63.  Levi also increased its deferred tax valuation allowance in 2003 by recording a one-time $282 million increase. *Id.* ¶¶ 42, 53, 63.  Plaintiffs allege that this increase was due to understated tax expenses in 2001 and 2002. *Id.*

**C.     2001, 2002, and 2003 Restatements**

In May 2002 Levi changed its outside auditors from Arthur Andersen to KPMG LLP ("KPMG").  KPMG reaudited Levi's financial statements for the fiscal years 2001, 2002, and 2003[2] and determined that certain restatements were required for the 2001 and 2002 financial statements, as well as the first two quarters of 2003. *See* Defs.' Request for Judicial Notice[3] ("Defs.' RJN"), Ex. 1 (2003 Form 10-K) at 81.  KPMG issued an unqualified opinion as to the 2001, 2002, and 2003 financial statements, as restated and reflected in the 2003 Form 10-K. *Id.*  Levi's 2003 Form 10-K describes the particular restatements as:

- $24 million increase in tax expense and tax liability in 2001 resulting from the tax deduction taken twice in error for losses related to closures of various plants.

- $19 million of increased tax expense in 2001 and 2002 to properly provide for a valuation allowance against deferred tax assets consisting of foreign net operating losses of subsidiaries in a cumulative loss position.

- $21.2 million of additional rent expense related to periods before 2003, which resulted in $3.7 million of additional rent expense in 2001 and $2.6 million of additional rent expense in 2002 to properly reflect occupancy costs and leases in accordance with GAAP.

- $35.4 million in over-accruals of obsolete inventory, which resulted in the reversal of $17 million of inventory accruals for 2001 and $6.9 million of inventory accruals in 2002.

---

[2]     Levi's fiscal year ends on the last Sunday of November each year.  The relevant year end dates are November 25, 2001, November 24, 2002, and November 30, 2003. Defs.' RJN, Ex. 1 at 81.

[3]     The court hereby grants defendants' request that the court take judicial notice of Levi's SEC filings referenced in plaintiffs' CAC. *See Dreiling v. American Exp. Co.*, 458 F.3d 942, 946 (9th Cir. 2006) (SEC filings proper matter for judicial notice by court).

1   •   $10.4 million reversal of workers' compensation expense in 2001 for an over-accrual of such

2       expenses.

3   •   $8.5 million reversal of incentive compensation expense recorded in 2001 instead of 2000.

4   •   $10.9 million reversal of restructuring costs in 2001 relating to costs improperly accrued.

5   •   $10.4 million reversal of restructuring costs improperly accrued in 2002 and $6.3 million

6       reversal of income from sale of assets in 2003 related to plant closures in 2002.

7   •   $2.6 million of additional restructuring costs that were improperly taken in 1999, but should

8       have been charged to later years.

9   •   $0.9 million reversal of amortization expense in 2001 and $1.8 million reversal of

10      amortization expense in 2002, which expenses should have been recorded in 1999.

11  *Id.* at 100-01.

12          **D.      Allegations Regarding Scienter**

13          Plaintiffs rely primarily on statements from two former managers in Levi's tax department,

14  Thomas Walsh ("Walsh") and Robert Schmidt ("Schmidt") to support allegations of scienter on the

15  part of defendants.[4]  They also offer statements from two confidential witnesses ("CW").

16          **1.      Thomas Walsh**

17          Walsh worked for Levi from September 27, 1999 to December 10, 2002, when Levi

18  terminated his employment.  He started as an international tax manager in the global tax department,

19  was subsequently promoted to senior tax manager, and on February 28, 2001 was again promoted to

20  international tax director.  State Compl. ¶ 85.  As one of five tax directors, Walsh's responsibilities

21  included preparing Levi's worldwide tax return, establishing Levi's worldwide tax provisions,

22  integrating the Asia Pacific tax divisions, and carrying out various duties as a member of Levi's

23  leadership team.  CAC ¶ 158.  In order to calculate the worldwide tax provision for 2001 and 2002,

24

25  [4]      Schmidt and Walsh have filed a State Complaint, CGG-03-419398, *see* Req. J. Notice Supp.
    Def.'s Mot. Dismiss ("Req. J. Notice") Ex. 3, and a Federal Complaint, C-04-01026-RMW, *see* Req.
26  J. Notice Ex. 2, which add clarification to certain allegations in the Consolidated Amended
    Complaint ("CAC").  The court takes judicial notice of these complaints. *See Fecht v. Price Co.*, 70
27  F.3d 1078, 1080 n.1 (9th Cir. 1995) ("documents whose contents are alleged in a complaint and
    whose authenticity no party questions, but which are not physically attached to the pleading, may be
28  considered in ruling on a Rule 12(b)(6) motion to dismiss").

ORDER GRANTING IN PART AND DENYING IN PART  MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
C-03-05605 RMW
TNL/SPT                                                   7

Walsh was required to analyze, *inter alia*, how tax accounting reserves were established and released, the availability and prior use of foreign tax credits, and the application of valuation allowances against credits. *Id.*

Plaintiffs allege that in late 1999 Walsh voiced concerns over various tax positions that he thought were illegal to his supervisor Laura Liang ("Liang"), who at the time was vice president of international tax, and reported directly to defendant Chiasson, Levi's senior vice president and CFO during the Class Period. Walsh specifically questioned Liang about a "conduit financing scheme" that he believed constituted ongoing improper recognition of unrealizable foreign tax credits as deferred tax assets. *Id.* ¶ 185. Walsh also stated that Liang and Vince Fong, Levi's vice president and tax department head, told him that Levi released reserves to achieve its desired tax rate when he raised the issue of improperly released reserves from 1995 to 2001. *Id.* ¶ 159. Following his promotion to international tax director in February 2001, Walsh began questioning Fong about tax accounting practices that Walsh felt were improper.[5] *Id.* ¶ 186. Walsh claims that Fong disregarded these concerns and refused to let him speak to the IRS after he raised the issue of improper use of a tax shelter in 2002. *Id.* ¶¶ 186, 194-95.

In May 2002 Levi replaced its outside auditor, Arthur Andersen, and Fong convened a meeting to discuss how Levi should work with its new auditor, KPMG. *Id.* ¶ 187.[6] The attendees included Fong, Walsh, Liang, and other members of the tax leadership team, Mike Woo and Denise Cahalan. Plaintiffs allege that at the meeting, Fong instructed the attendees that "[w]e are only going to show the auditors what we want them to see." *Id.* In response, Walsh allegedly stated that withholding information from KPMG would constitute fraud and he would not be a party to it. *Id.* That same month, plaintiffs allege that Walsh informed Chiasson that he believed Levi's reported net income was overstated as a result of Levi's improper release of excess reserves and improper recognition of unrealizable foreign tax credits as deferred tax assets. *Id.* ¶ 188. As a result, Walsh

---

[5]     Plaintiffs allege that Walsh began questioning Fong about the practices set forth in § B above.

[6]     The parties refer to Deloitte & Touche ("Deloitte") as another independent accounting firm retained by the company, but the specific scope and timing of Deloitte's work remain unclear.

ORDER GRANTING IN PART AND DENYING IN PART  MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
C-03-05605 RMW
TNL/SPT                                                                 8

1    was "effectively frozen" out of his role on the leadership team and management of the global tax

2    department.  On December 10, 2002 Walsh's employment was terminated "for cause."  *Id.* ¶ 189.

3                    **2.    Robert Schmidt**

4           Schmidt worked in Levi's global tax department from June 18, 2001 to December 10, 2002

5    as senior manager for international tax until Levi terminated his employment.  *Id.* ¶ 159; State

6    Compl. ¶ 71.  As one of his first assignments, Schmidt was to review Levi's LSLA tax shelter and

7    determine how it could be closed.  CAC ¶ 192.[7]  In January 2002 Fong and Liang assigned Schmidt

8    to manage issues related to the LSLA transaction.  *Id.* ¶ 194.[8]  While visiting Brazil, Schmidt

9    discovered a number of non-privileged documents he believed were relevant to Information

10   Document Requests ("IDRs") which had been issued by the IRS.  *Id.*  The State Complaint clarifies

11   that Schmidt believed the LSLA's "reconciliation statements" did not reconcile, and that he found a

12   $12,000,000 variance between the books tracking the LSLA's activities in Brazil cruzados, and those

13   tracking the same activities in U.S. dollars.  State Compl. ¶ 76.  Plaintiffs claim that these

14   transactions resulted in improper tax deductions between 1986 and 1994.[9]  According to plaintiffs'

15   allegations, after informing Liang and Fong that he believed these documents should be produced to

16   the IRS, Schmidt was directed by Liang and Fong to withhold them, and that same day he was

17   replaced as the primary IRS contact by Jim Fuller of the Fenwick & West law firm ("Fenwick").

18   CAC ¶ 195.  Plaintiffs allege that boxes of materials brought back from Brazil were withheld from

19   the IRS.  *Id.* ¶ 196.  On December 10, 2002 Schmidt's employment with Levi was terminated "for

20   cause."  *Id.* ¶ 197.

21

22

23   [7]      Neither party specifies what "LSLA" or "BSEI" stands for.

24   [8]      Specifically, plaintiffs allege that Levi created the LSLA tax shelter in 1976 by making a
     $100,000 capital investment into the LSLA partnership, which had no business purpose, employees
25   or assets.  LSLA then borrowed $10 million in Brazilian currency from local banks in Brazil, and
     used the funds to buy a minority interest in LS Brazil, an indirectly held subsidiary of Levi.  CAC ¶
26   194.  LS Brazil refinanced a portion of the loan in 1989, and in 1990 the remainder of this loan was
     refinanced by BSEI, a domestic subsidiary of Levi.
27
     [9]      Because the earliest financial statement at issue here is for fiscal year 1996, these allegations
28   are not relevant to the present motion.

### 3. Confidential Witnesses

CW1 worked for Levi from the summer of 2002 to early 2003 as a manager of internal reporting. *Id.* ¶ 199. CW1 reported directly to Caroline Chow, the director of financial reporting, who reported to defendant Gary Grellman, Levi's vice president and corporate controller during the Class Period. *Id.* CW1 allegedly was told not to ask any questions or to analyze any of the financial reports of the various subsidiaries to be consolidated. *Id.* According to CW1, Levi's record keeping was purportedly extremely poor or nonexistent. *Id.*

CW2 worked for Levi from early 2000 to early 2004 as a certified internal auditor. *Id.* ¶¶ 200-01. CW2 states that the internal auditors were not allowed to audit tax transactions and entities such as Finserv, and that such audits were outsourced to the outside auditors due to their purportedly being "too technical." *Id.* However, CW2 contends, the internal auditors audited equally technical and complicated areas. *Id.* CW2 submits that Levi outsourced the transactions because the outside auditors employed "less due diligence" and shared a long-standing close relationship with Levi. *Id.*

## II. SECURITIES ACT CLAIMS

Counts I through III of plaintiffs' complaint allege violations of the Securities Act based on the April 2001 Offering. Count I alleges a violation of § 11 against Levi and the individual defendants (except Grellman), count II alleges a violation of § 12(a)(2) against Levi and the individual defendants (except Grellman), and count III alleges control person liability against the individual defendants (except Grellman) based on the alleged violations of §§ 11 and 12(a)(2). Counts IV through VI of plaintiffs' complaint allege violations of the Securities Act based on the June 2003 Offering. Count IV alleges a violation of § 11 against Levi and the individual defendants (except Friedman), count V alleges a violation of § 12(a)(2) against Levi and the individual defendants (except Friedman), and count VI alleges control person liability against the individual defendants (except Friedman) based on the alleged violations of §§ 11 and 12(a)(2).

### A. Section 11 Claims

Section 11 of the Securities Act provides for a cause of action against, *inter alia*, signers of the registration statement and directors, for an untrue statement of a material fact or an omission of a material fact in a registration statement:

1

2          In case any part of the registration statement, when such part became effective,
           contained an untrue statement of a material fact or omitted to state a material fact
3          required to be stated therein or necessary to make the statements therein not
           misleading, any person acquiring such security (unless it is proved that at the time
           of such acquisition he knew of such untruth or omission) may, either at law or in
4          equity, in any court of competent jurisdiction, sue . . . .

17 U.S.C. § 77k.
5

6          A plaintiff need not allege scienter on the defendants part for liability under § 11.  *Kaplan v.*

*Rose*, 49 F.3d 1363, 1371 (9th Cir. 1994) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375,
7

382 (1983)).  "[D]efendants will be liable for innocent or negligent material misstatements or
8

omissions."  *Id.*  As the Supreme Court has explained, § 11 "was designed to assure compliance with
9

the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who
10

play a direct role in a registered offering":
11

12          If a plaintiff purchased a security issued pursuant to a registration statement, he need
            only show a material misstatement or omission to establish his prima facie case.
13          Liability against the issuer of a security is virtually absolute, even for innocent
            misstatements.  Other defendants bear the burden of demonstrating due diligence.
            *See* 15 U.S.C. § 77k(b).
14

*Huddleston*, 459 U.S. at 381-82.  "The plaintiff in a § 11 claim must demonstrate (1) that the
15

registration statement contained an omission or misrepresentation, and (2) that the omission or
16

misrepresentation was material, that is, it would have misled a reasonable investor about the nature
17

of his or her investment."  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (quoting *In re*
18

*Stac Elecs. Secs. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir. 1996)) (internal quotations omitted).
19

20          Defendants argue that plaintiffs have failed to plead that the alleged misstatements and

omissions were material and that plaintiffs do not qualify as persons "purchasing" securities
21

pursuant to a registration statement because the plaintiffs acquired their bonds through an exempt
22

Rule 144A private transaction followed by an *Exxon Capital* exchange.  Defendants assert that lead
23

plaintiffs Detroit General and Metzler Investment lack standing to sue under § 11 either for their
24

initial purchase of unregistered bonds in the private placement pursuant to 17 C.F.R. § 230.144A
25

("Rule 144A") or to the subsequent exchange of the unregistered bonds for publicly registered bonds
26

pursuant to the exchange offering.  Defendants also argue that the heightened pleading standard of
27

Fed. R. Civ. P. 9(b) applies as to plaintiffs' pleadings.
28

Plaintiffs argue that, as a general proposition, profit statements and financial reports are of particular interest to investors and are by their nature relevant to investment decisions.  The Supreme Court has held that "[a]n omitted fact [or misstatement] is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotations omitted).  However, "to fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Id.* at 231-32 (quoting *TSC Indus.*, 426 U.S. at 449) (internal quotations omitted).  "[T]o have standing under section 11, plaintiffs must establish that they purchased shares either (1) directly in the public offering for which the misleading registration statement was filed or (2) traceable to that public offering."  *Guenther v. Cooper Life Sciences, Inc.*, 759 F. Supp. 1437, 1439 (N.D. Cal. 1990).  The plaintiff "must have purchased a security issued under [the registration statement alleged to be misleading], rather than some other, registration statement."  *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999).

### 1. Initial Private Placement Purchase

As to the initial purchase of unregistered Levi bonds pursuant to private placements, plaintiffs clarify in opposition that they do not seek to base their § 11 claims on the offering documents associated with the private placements.  In any event, plaintiffs do not dispute that the initial private placements were made pursuant to Rule 144A or that lead plaintiffs Detroit General and Metzler Investment are considered Qualified Institutional Buyers ("QIB") within the meaning of Rule 144A.[10]  Section 11 liability, which applies to misstatements or omissions in registration statements, is not available for Rule 144A offerings.  *See* 17 C.F.R. § 230.144A (Rule 144A offerings are exempt from § 5 registration requirements); *In re Refco, Inc. Sec. Litig.*, 2007 WL 1280649 (S.D.N.Y. Apr. 30, 2007).

---

[10]    Certain institutional investors that own and invest on a discretionary basis at least $ 100 million are known as QIBs.

## 2.   *Exxon Capital* Exchange

As to the acquisition of registered Levi bonds, defendants point out that Detroit General and Metzler Investment obtained their registered bonds by trading in unregistered bonds they initially purchased in private placements exempt from registration under Rule 144A for identical publicly registered bonds in a transaction known as an *Exxon Capital* exchange.  Although it is not clear from the complaint the manner in which each plaintiff purports to have obtained the publicly registered bonds, plaintiffs do not dispute that those plaintiffs who obtained shares through the Rule 144A private placement followed by the exchange for identical publicly registered bonds obtained their publicly registered bonds in an *Exxon Capital* exchange.  As to those plaintiffs who obtained their publicly registered bonds in this manner, defendants claim that since both the original sale of the unregistered bonds and the subsequent exchange were made to plaintiffs as QIBs in compliance with Rule 144A, defendants are exempt from any registration requirements or liability under § 5.

In an *Exxon Capital* exchange an issuer registers securities for an exchange offering in which the holders of its unregistered bonds may exchange their bonds for identical publicly registered bonds.  *See In re Refco, Inc. Sec. Litig.*, 2007 WL 1280649, *2 (S.D.N.Y. Apr. 30, 2007); *see also Exxon Capital Holdings Corp.*, S.E.C. No Action Letter, 1988 WL 234336, publicly available May 13, 1988.[11]  In *Refco*, the company issued senior subordinated notes due in 2012 that were sold to

---

[11]     As explained by the court in *In re Livent Noteholders Sec. Litig.* ("*Livent I*"), an *Exxon Capital* transaction is a capital raising technique where an issuer first sells securities to an initial purchaser in a private offering exempt from the registration requirements of the Securities Act, who is then authorized to sell the unregistered securities to QIBs in a private transaction similarly exempt from registration under Rule 144A.  The court elaborated:

> Rule 144A offerings are often followed by SEC-registered exchange offers (referred to as "AB exchange offers" or "*Exxon Capital* exchange offers") where the issuer (usually pursuant to a contractual commitment in the Rule 144A offering documents) offers to holders of the Rule 144A securities to exchange those securities for similar securities which have been registered and, therefore, are freely resalable. Participants in the exchange offer receive freely resalable securities only if they are not affiliated with the issuer, acquired the original securities in the ordinary course of business and do not have an arrangement with the issuer for the distribution of the exchange securities. Under these circumstances, the exchange of privately placed securities for similar registered securities occurs without subjecting the holders to classification as underwriters.

151 F. Supp. 2d 371, 431 (S.D.N.Y. 2001) (citing *Exxon Capital Holding Corp.*, SEC No-Action

1   underwriters who immediately resold the bonds to institutional buyers.  *Id.*  These transactions were

2   exempt from registration pursuant to Rule 144A since the purchasers were QIBs.  *Id.*  Refco

3   subsequently registered bonds in a Form S-4 Registration Statement for the purpose of allowing

4   holders of the Rule 144A unregistered bonds to exchange their bonds for registered bonds.  *Id.*  The

5   unregistered bonds and registered bonds were not alleged to differ in any respect other than that the

6   registered bonds were freely tradeable.  *Id.* at *17.

7          In *Refco*, the defendants submitted that there could not be a § 11 claim by plaintiffs who

8   obtained their publicly registered bonds through the *Exxon Capital* exchange, arguing that the

9   registration statement had nothing to do with the unregistered bondholders' decision to exchange

10   their unregistered bonds for registered bonds.  *Id.* at *15.  One defendant framed the issue as a

11   failure to plead materiality and another suggested it was an issue of standing.  The court observed

12   that "[t]he questions of standing, reliance, materiality, and causation are related, because 'materiality

13   is intimately bound up with the concept of reliance,' and 'reliance, in turn, is linked to causation.'"

14   *Id.* (quoting *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1248, 1260 (N.D. Cal. 2000)).

15   In other words, "a misstatement is material if an investor acted in reliance upon it and was thereby

16   caused to suffer damages." *Id.*  The court recognized that caselaw is not clear as to whether § 11

17   imposes a reliance requirement, but concluded that the better reading of § 11 seems to be that it

18   "'creates a presumption that any person acquiring such a security was legally harmed by the

19   defective registration statement.'" *Id.* (quoting *APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476

20   F.3d 1261, 1271 (11th Cir. 2007)) (additional internal quotation marks omitted).  The court held that

21   if it is established with certainty that the plaintiffs are not harmed in any way by the relevant

22   misrepresentations, plaintiffs should not be allowed any recovery under § 11 as a matter of law

23   based on either a lack of materiality or a lack of reliance.  *Id.*  Therefore, the *Refco* court concluded,

24   the relevant question is what the unregistered bondholders, who already owned non-tradeable shares

25   _____

26   Letter (May 13, 1988), *Morgan Stanley & Co. Incorporated*, SEC No-Action Letter (June 5, 1991)).
     By avoiding a designation as an "underwriter," private purchasers are not deemed to be engaged in
     distribution of covered securities, and are able to resell those securities without filing their own

27   registration statement.  *See id.* (citing Securities Act § 4(1), 15 U.S.C. § 77d(1)).  This in turn
     "enables issuers to raise capital by promoting liquidity in the secondary markets for the securities

28   and also enhances the attractiveness of domestic markets to foreign and local investors." *Id.*

1   of Refco, "could have done differently had the registration statement been fully candid about Refco's

2   alleged foul deeds and dreadful prospects." *Id.* at *16.

3         The court found that the plaintiffs had not alleged that the unregistered bondholders would

4   have been any less likely to go through with the *Exxon Capital* exchange had the registration

5   statement been accurate.  In particular, based on the nature of the transactions—a Rule 144A exempt

6   transaction followed by an *Exxon Capital* exchange—the unregistered bondholders were essentially

7   given the opportunity to exchange their unregistered bonds for bonds that are identical in all respects

8   except that they are freely tradeable.  *Id.* at *17.  The court inferred that these allegations fail to

9   support a showing of materiality (or reliance) because "[h]ad the plaintiffs known the true state of

10  Refco's affairs, they would have had no reason to avoid making . . . their holdings tradeable; on the

11  contrary, they would have had every reason to rid themselves of the bonds as soon as possible." *Id.*

12  Therefore, the court dismissed the § 11 claims of those plaintiffs who obtained their registered bonds

13  in the *Exxon Capital* exchange.  *Id.*

14        Although the court recognizes that, at least in this circuit, reliance is not an element of a § 11

15  claim, the court finds the reasoning of the *Refco* court to be persuasive here on the issue of

16  materiality.  Like in *Refco*, the relevant transactions before this court are initial Rule 144A private

17  offerings by Levi pursuant to which certain QIBs chose to invest in unregistered Levi bonds

18  followed by *Exxon Capital* exchange offerings in which Levi registered identical bonds for the

19  purpose of allowing the QIBs holding unregistered Levi bonds to exchange their unregistered bonds

20  for registered bonds with the same terms.  As in *Refco*, the only distinction between the QIBs'

21  unregistered bonds and the exchanged bonds is that the exchanged bonds were registered.  In other

22  words, they became freely tradeable in the market without further registration.  *See Exxon Capital*

23  *Holdings Corp.*, S.E.C. No Action Letter, 1988 WL 234336.  Following the *Refco* court's reasoning

24  and analysis, then, it does not appear likely that the alleged misstatements or omissions in the

25  registration statements issued to enable the *Exxon Capital* exchanges could have been material to the

26  unregistered bondholders' decision whether to accept the exchange or hold onto the unregistered

27  bonds they had already purchased via earlier exempt Rule 144A transactions.  The purpose of the

28  exchange offerings was to provide the bondholders with freely tradeable bonds without any further

1   registration.  *See Livent I*, 151 F. Supp. 2d at 431.  As with the unregistered bondholders in *Refco*,

2   the decision was either to continue to hold the unregistered bonds which, absent registration, could

3   only be sold under certain limited exemptions from the Securities Act, or to exchange the

4   unregistered bonds for registered bonds that were identical in all respects except that they were

5   freely tradeable in the public market without further registration.  *See also In re Safety-Kleen Corp.*,

6   2002 WL 32349819, *1 (D.S.C. 2002) (As to a registration statement filed pursuant to the Securities

7   Act to effect an *Exxon Capital* exchange "for identical bonds that could be exchanged for the

8   unregistered bonds . . . . no damages can be demonstrated because the transaction involves two sets

9   of identical bonds.  Furthermore, reliance cannot be demonstrated because any false statements in

10  the registration of the second set of bonds could not have any influence on the purchasers' decision

11  to exchange one set of identical bonds for another.").

12          The court does not find plausible plaintiffs' assertion that, had the registration statements

13  disclosed the asserted omissions or misstatements, plaintiffs could have decided to retain the

14  unregistered bonds which could be sold to other institutional investors in private transactions as is

15  common practice in the bond industry.  Plaintiffs assert no facts to indicate that had the alleged

16  misstatements and omissions been disclosed at the time of the registrations that other institutional

17  investors would have been interested in purchasing their unregistered securities.  As noted earlier,

18  registered bonds differ from unregistered bonds in that the registered bonds became freely tradeable,

19  which makes it easier for the bondholders to sell their bonds.

20          The court is also not persuaded by plaintiffs' additional arguments.  Plaintiffs cite *7547 Corp.*

21  *v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211 (5th Cir. 1994), for the proposition that an

22  exchange of one security for another pursuant to a registration statement constitutes an "acquisition"

23  for purposes of § 11.  In *7547 Corp.*, the complained of transaction was one where the assets,

24  liabilities, and operations of a partnership in which plaintiffs held interests were combined into a

25  newly-formed corporation.  *Id.* at 214-15.  The transaction did not involve an *Exxon Capital*

26  exchange.  Rather, the former partnerships were liquidated and the plaintiffs were given shares of

27  registered stock in the resulting corporation in exchange for their former partnership interests.  *Id.*

28  However, *7547 Corp.* is distinguishable.  Unlike the case here, the securities formerly held by the

*7547 Corp.* plaintiffs differed significantly from the stock subsequently issued.  Further, unlike the *Exxon Capital* exchange at issue it the present action, the *7547 Corp.* plaintiffs' former partnerships were liquidated and converted into the equivalent value of stock.

Therefore, the court concludes that the alleged misstatements and omissions would not have been material to the unregistered bondholders' decision whether to exchange unregistered shares they had already chosen to purchase pursuant to the Rule 144A offering documents.  Because the unregistered bondholders had already invested in Levi bonds through the Rule 144A offerings, they were not presented with the decision of whether or not to purchase Levi bonds pursuant to the registration statement.  *Compare In re Livent Noteholders Sec. Litig.*, 174 F. Supp. 2d 144, 157 (S.D.N.Y. 2001) ("*Livent II*") (allowing plaintiff noteholders' § 11 claim against defendant and underwriter CIBC where the complaint alleged that plaintiffs and other public investors, including QIB's, were solicited personally by and purchased notes directly from CIBC "*after they had been registered.*").  The purpose of the Securities Act's registration requirements is to protect investors.  *See Huddleston*, 459 U.S. at 381-82; *Securities and Exchange Commission v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953) ("The design of the [Securities Act] is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions."); *United States v. Naftalin*, 441 U.S. 768, 777-78 (1979) ("[T]he 1933 Act was primarily concerned with the regulation of new offerings.").  Here, the purpose of registering Levi bonds was to give the unregistered bondholders registered bonds, which they could then offload in the public market without further registration.  It follows that the purpose of the registration statements at issue was to protect the potential investors in the public market who may be purchasers of the registered bonds not based on a Rule 144A offering documents, but based on the registration statements' disclosures.  Accordingly, the court dismisses the § 11 claims as to those plaintiffs who received their registered bonds through an exchange of unregistered bonds acquired in the preceding Rule 144A offerings.

### 3.      Untrue Statement or Omission of Material Fact

Defendants do not argue that plaintiffs who purchased their Levi bonds in the after market

1   lack standing to sue under § 11.[12]  However, defendants contend that the § 11 claims should be

2   dismissed on grounds that plaintiffs have failed to state with particularity the untrue statements or

3   omissions of material fact in the registration statements for the April 2001 Offering and the June

4   2003 Offering when they became effective.  In particular, defendants argue that because plaintiffs' §

5   11 claims are "grounded in fraud" and, therefore, must be pled with specificity pursuant to Fed. R.

6   Civ. P. 9(b).  Plaintiffs contend that Rule 8(a) applies because their § 11 claims are based in

7   negligence and pled separately from their § 10(b) claim.

8         The court concludes that Rule 9(b) applies to plaintiffs' § 11 claims.  As the Ninth Circuit

9   stated in *In re Daou*, 411 F.3d at 1027, "[a]lthough section 11 does not contain an element of fraud,

10  a plaintiff may nonetheless be subject to Rule 9(b)'s particularity mandate if his complaint 'sounds in

11  fraud': [T]he plaintiff may allege a unified course of fraudulent conduct and rely entirely on that

12  course of conduct as the basis of a claim."  In such a case, "the claim is said to be 'grounded in fraud'

13  or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity

14  requirement of Rule 9(b)."  *Id.* (quoting *Vess v. Ciby-Geigy Corp. USA*, 317 F.3d 1097, 1103-05 (9th

15  Cir. 2003)) (internal quotations omitted); *see also In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399,

16  1404-05 (9th Cir. 1996) (holding that the particularity requirements of Rule 9(b) apply to claims

17  brought under § 11 where they are grounded in fraud).  As defendants point out, although plaintiffs

18  separate allegations supporting their § 11 claims from allegations supporting their § 10(b) claim, the

19  § 11 allegations nevertheless reiterate the same alleged conduct and course of conduct which

20  underlie the § 10(b) claim.  Further, as noted by defendants, plaintiffs allege that defendants engaged

21  in "tax fraud" and a "fraudulent tax scheme" resulting in misstated financial statements in the

22  registration statement.  These same misstatements are alleged as violations in plaintiffs' § 10(b)

23

24  [12]    The court notes that in *Stack v. Lobo*, 903 F. Supp. 1361, 1375-76 (N.D. Cal. 1995), the court held that § 11 does not extend to after market transactions.  On the other hand, the court in *Feiner v.*

25  *SS&C Techs., Inc.*, 47 F. Supp. 2d 250 (D. Conn. 1999), held that "any purchaser has standing to sue under section 11 so long as the securities purchased can be traced back to the offering containing the

26  allegedly defective registration statement."  *Id.* at 252 (citing *In re Fine Host Corp. Sec. Litig.*, 25 F. Supp. 2d 61, 67 (D. Conn. 1998)) (internal quotation marks omitted).  The court also relied in part

27  on the Second Circuit's interpretation of § 11 in *Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967). The court reasoned that because the case involved an initial public offering, by definition, all shares

28  purchased by the public could be traced back to the initial public offering regardless of whether the shares were purchased during the initial distribution.

1   claim.  Although plaintiffs separate their § 11 allegations from their § 10(b) claim, the added

2   allegations primarily assert additional purported misstatements in Exchange Act filings which are

3   actionable under § 10(b) but not actionable under § 11.  Notably, the § 10(b) allegations  incorporate

4   all the allegations made in support of plaintiffs' Securities Act claims.

5           Nevertheless, as the *Daou* court made clear, that Rule 9(b) applies does not necessarily mean

6   plaintiffs' § 11 claims fail:

> In a case where fraud is not an essential element of a claim, only allegations of
> fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b).
> Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading
> standards of Rule 8(a). . . .  Where averments of fraud are made in a claim in which
> fraud is not an element, an inadequate averment of fraud does not mean that no claim
> has been stated.  The proper route is to disregard averments of fraud not meeting
> Rule 9(b)'s standard and then ask whether a claim has been stated.

11  *Id.* at 1027 (internal citations and quotations omitted).  Here, as to untrue statements in the

12  registration statements, plaintiffs allege, *inter alia*, that Levi misstated its 2001 financial statements

13  because it has recorded a tax deduction twice.  CAC ¶¶ 7, 42-43.[13]  Levi initially corrected this error

14  by recording an adjustment in the third quarter of 2003.  *Id.* ¶ 178.  However, KPMG determined

15  that the proper correction was a restatement of Levi's 2001 financial statements and Levi's failure to

16  identify the error (or properly correct it) represented a failure in its internal controls for detecting

17  and preventing misstatements of accounting information.  *Id.* ¶ 179.  Levi was required to restate its

18  2001 financial statements to correct for the misstatement.  Plaintiffs allege that KPMG identified

19  material weaknesses in Levi's internal accounting controls.  *Id.* ¶¶ 10, 76.  Specifically, KPMG

20  advised Levi that (1) its global controller's group, corporate controller, and CFO needed to increase

21  their involvement in the review and disclosure of tax items as they relate to GAAP and (2) Levi

22  needed to appoint individuals in the tax department and controller's group with sufficient expertise

23  in tax GAAP issues.  *Id.* ¶¶ 178-80.  Thus, even absent allegations of fraudulent conduct, plaintiffs

24  have alleged sufficient facts of misstatements in the financial information contained in Levi's

25  registration statements in violation of § 11.  *See Kaplan v. Rose*, 49 F.3d at 1371 ("[D]efendants will

26  be liable for innocent or negligent material misstatements or omissions.") (citation omitted).

27

28  [13]    The 2001 financials were included in the June 2003 registration statement, but not the April
    2001 registration statement.

ORDER GRANTING IN PART AND DENYING IN PART  MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
C-03-05605 RMW
TNL/SPT                                                          19

1    Accordingly, the court finds that the complaint sufficiently alleges that Levi's registration statements

2    contain an untrue statement or omission of material fact.

3        **B.    Section 12(a)(2) Claims**

4        Section 12(a)(2) provides for civil liability of securities sellers to purchasers if the seller used

5    certain instruments, including a prospectus, containing untrue statements or material omissions.  15

6    U.S.C. § 77l(a)(2)[14]; *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133-34 (9th Cir. 2002).  Here,

7    plaintiffs assert that the "prospectuses" containing material false financial information are Levi's

8    prospectus and registration statement for the April 2001 Offering and Levi's prospectus and

9    registration statement for the June 2003 Offering.[15]  *See* CAC ¶¶ 15-17.  Defendants argue that

10   plaintiffs' § 12 claims fail for lack of standing.  As to those plaintiffs that exchanged their

11   unregistered bonds for registered bonds, defendants contend there is no standing because the bonds

12   were not purchased in a public offering.  As to those plaintiffs who purchased their bonds in the after

13   market, defendants submit that there is no standing because § 12 liability only attaches to securities

14   sold in the initial offering, not those purchased in the secondary market.

15

16

---

17   [14]    Section 12(a)(2), codified at 15 U.S.C. § 77l(a)(2), provides in relevant part:

18       Any person who--

19       (2) offers or sells a security (whether or not exempted by the provisions of section
         77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section),
20       by the use of any means or instruments of transportation or communication in
         interstate commerce or of the mails, by means of a prospectus or oral
21       communication, which includes an untrue statement of a material fact or omits to
         state a material fact necessary in order to make the statements, in the light of the
22       circumstances under which they were made, not misleading (the purchaser not
         knowing of such untruth or omission), and who shall not sustain the burden of proof
23       that he did not know, and in the exercise of reasonable care could not have known,
         of such untruth or omission,
24
         shall be liable, subject to subsection (b) of this section, to the person purchasing such
25       security from him, who may sue either at law or in equity in any court of competent
         jurisdiction, to recover the consideration paid for such security with interest thereon,
26       less the amount of any income received thereon, upon the tender of such security, or
         for damages if he no longer owns the security.
27
     [15]    It is unclear from plaintiffs' complaint whether the alleged false financial information are
28   contained in both the prospectus and the registration statement for each exchange offering.

ORDER GRANTING IN PART AND DENYING IN PART  MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
C-03-05605 RMW
TNL/SPT                                20

1

**1.        Plaintiffs Who Exchanged Unregistered Bonds for Registered Bonds**

2          In *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995), the Supreme Court clarified the meaning of

3   the term "prospectus" for purposes of § 12(a)(2).  The Court held that "the liability imposed by §

4   12[a](2)[16] cannot attach unless there is an obligation to distribute the prospectus in the first place."

5   *Id.* at 571.  In addition, "the term 'prospectus' relates to public offerings by issuers and their

6   controlling shareholders," and "was well understood to refer to a document soliciting the public to

7   acquire securities from the issuer."  *Id.* at 575-76.  The Court observed that the legislative history

8   "states with clarity and with specific reference to § 12 that § 12 liability is imposed only as to a

9   document soliciting the public."  *Id.* at 581.  In particular, "The House Report stated: 'The bill affects

10  only new offerings of securities. . . .  It does not affect the ordinary redistribution of securities unless

11  such redistribution takes on the characteristics of a new offering.'"  *Id.* at 580 (citing H.R. Rep. No.

12  85, 73d Cong., 1st Sess., 5 (1933)).  Moreover, the Court noted, the legislative history "lack[s] . . .

13  any explicit reference to the creation of liability for private transactions."  *Id.* at 582.

14         Here, plaintiffs agree that to state a claim for relief under § 12(a)(2), they are required to

15  plead that they purchased a security pursuant to a prospectus, that the prospectus contained an untrue

16  statement, and that the untrue statement was material.  Pls.' Opp'n Defs.' Mot. Dismiss at 24:7-10.

17  Plaintiffs assert that the first requirement is met because they have pled that they acquired Levi's

18  registered bonds by means of Levi's prospectuses, that those prospectuses reported false financial

19  statements, and that the false financial information were material.  *Id.* at 24:10-14 (citing CAC ¶¶ 3,

20  15-17, 65-68, 70-73).  However, as discussed in § II.A.2 above, those plaintiffs who exchanged

21  unregistered bonds for registered bonds did not purchase their bonds pursuant to a registration

22  statement.  For the same reasons, these plaintiffs did not purchase their bonds pursuant to a

23  prospectus.  Rather, their purchases of Levi bonds were made pursuant to private offerings exempt

24  from registration under Rule 144A.  In the following *Exxon Capital* exchange, these plaintiffs

25  merely exchanged their unregistered bonds for bonds that would be freely tradeable in the public

26  market.  As discussed in § II.A.2 above, plaintiffs' allegations do not support a plausible inference

27

28  _____

[16]       In 1995 the statute was amended and what was formerly § 12(2) became § 12(a)(2).

ORDER GRANTING IN PART AND DENYING IN PART  MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
C-03-05605 RMW
TNL/SPT

1    that any alleged false financial statements in the registration statements or prospectuses were

2    material to the decision of holders of unregistered Levi bonds to exchange such bonds for freely

3    tradeable registered bonds.

4           The court notes that Levi necessarily had to comply with the registration requirements of the

5    Securities Act in order to issue bonds that would be freely tradeable to the public and, therefore, the

6    prospectuses at issue likely relate to a public offering.  However, this does not mean those plaintiffs

7    who merely exchanged their unregistered bonds for registered bonds have standing under § 12(a)(2).

8    As with the § 11 claims, the alleged false financial statements in the registration statements and

9    prospectuses are not material to these plaintiffs.  Moreover, the purpose of the registrations were to

10   allow the holders of the unregistered bonds to be able to exchange their holdings for registered

11   bonds that they could then sell to the public.  Thus, looking to the substance of the transactions, the

12   purpose of the registration statements and prospectuses was to inform and protect members of the

13   investing public who would be purchasing the registered bonds from those plaintiffs who turned in

14   their unregistered bonds for freely tradeable ones.  *See In Re Safety-Kleen Corp. Bondholders Litig.*,

15   2002 WL 32349819 at *2 (holding that there was no public offering where the securities were sold

16   only to sophisticated QIBs and the exchange transaction was open only to those who had previously

17   purchased the unregistered bonds, namely, the same QIBs); *see also SEC v. Ralston Purina Co.*, 346

18   U.S. 119, 124-25 (1953) ("An offering to those who are shown to be able to fend for themselves is a

19   transaction 'not involving any public offering.'").

20                    **2.      Plaintiffs Who Purchased Levi Bonds in the Secondary Market**

21          Plaintiffs assert that Detroit P&F purchased its registered bonds on the open market and,

22   therefore, has standing under § 12(a)(2).  It also appears that certain of plaintiff Metzler Investment's

23   purchases were purchased in the after market.[17]  Plaintiffs rely upon *Feiner v. SS&C Techs., Inc.*, 47

24   F. Supp. 2d 250 (D. Conn. 1999), to support their proposition.  Defendants argue that only plaintiffs

25   who purchase securities pursuant to a prospectus directly from the issuer have standing under §

26   12(a)(2).  Defendants rely upon *Gould v. Harris*, 929 F. Supp. 353, 358-59 (C.D. Cal. 1996), *rev'd in*

27

28   [17]      It appears undisputed that these purchases were not made directly from Levi.

ORDER GRANTING IN PART AND DENYING IN PART  MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
C-03-05605 RMW
TNL/SPT                                                                 22

1  *part on other grounds* by *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076 (9th Cir. 1999).

2          In *Feiner*, the district court considered a motion by lead plaintiffs for class certification. 47

3  F. Supp. 2d at 251. The defendants opposed the motion arguing, *inter alia*, that the proposed class

4  definition was too broad in that it included persons who purchased shares in the after market rather

5  than in the initial public offering and who therefore lacked standing under §§ 11 and 12. *Id.* at 251-

6  52. As to § 12(a)(2) claims, the court concluded that *Gustafson* did not draw a distinction between

7  public offerings and after-market purchases, but rather distinguished public offerings from private

8  ones. *Id.* at 252-53. Because the registration framework requires delivery of a prospectus for a

9  fixed number of days after the registration statement becomes effective even if the initial distribution

10  has been completed, "sales by means of a prospectus" extends beyond the initial distribution. *Id.* at

11  253 (citing 15 U.S.C. §§ 77d-e; 17 C.F.R. § 230.174(d)[18]). The court held "§ 12(a)(2) extends to

12  aftermarket trading of a publicly offered security, so long as that aftermarket trading occurs 'by

13  means of a prospectus or oral communication.'" *Id.* In other words, "§ 12(a)(2) liability is

14  coextensive with the statutory and regulatory prospectus-delivery requirements." *Id.*

15          In *Gould*, the district court held that, based on *Gustafson*, neither § 11 nor § 12 extends to

16  securities purchases that are merely traceable to the public offering. 929 F. Supp. at 359. The court

17  relied in part on *In re Valence Technology Securities Litigation*, where the court reasoned that

18  because *Gustafson* held that § 12(a)(2) applies only to a transaction in which delivery of a

19  prospectus is required, "*Gustafson* makes irrelevant whether the transaction is 'traceable' to a public

20  offering." 1996 WL 37788, *4 (N.D. Cal. 1996). In *Stack v. Lobo*, citing *Gustafson*, the district

21  court similarly held that § 12(a)(2) applies only to public offerings, not after market transactions.

22  903 F. Supp. 1361, 1375 (N.D. Cal. 1995).[19] Likewise, in *Murphy v. Hollywood Entertainment*

23

24  [18]        The regulations generally provide that a dealer has certain obligations to deliver a prospectus
25  for securities transactions during either the 40 or 90 day period after the effective date of a
registration statement as specified in § 4(3) of the Securities Act, subject to certain exceptions.
26  Section 4(3) sets forth transactions that are exempt from the registration requirements.

27  [19]        Although the court stated that §12(a)(2) "applies only to initial public offerings, not
secondary transactions," the court's discussion makes clear that it was not distinguishing between an
issuer's initial public offering and subsequent public offerings by the issuer (which is sometimes
28  referred to as secondary or follow-on offerings), but rather distinguishing between purchases

1   *Corp.*, the district court reasoned that although *Gustafson*'s "actual holding was premised upon a

2   public/private distinction rather than the question presented here of the coverage of 12[a](2) for sales

3   direct from an offering versus after-market transaction, . . . the Court's *dicta* provides strong support

4   for finding a clear dividing line on shares purchased pursuant to an offering—either initial or

5   secondary—as cognizable for private remedies under either the 1933 and/or 1934 Act and shares

6   purchased in the aftermarket with a private right of action existing only under the 1934 Act."  1996

7   WL 393662, *3 (D. Or. 1996).

8        Although plaintiffs are correct that the *Feiner* court extended § 12(a)(2) liability to

9   aftermarket transactions, the court did not hold that § 12(a)(2) applies to all aftermarket transactions

10  so long as the transaction is traceable to the public offering.  As noted above, at most the court held

11  that § 12(a)(2) liability is *coextensive* with the prospectus-delivery requirements set forth in § 4(3)

12  applicable to *dealers* following the effective date of the registration statement (or the first date upon

13  which the securities are bona fide offered to the public).  *See* 15 U.S.C. § 77d(3).  This period is

14  generally forty days, but extended to ninety days if the public offering is the issuer's initial public

15  offering of securities.  *Id.*  Here, the complaint does not allege when plaintiffs' after market

16  purchases occurred.  In any event, the majority of the cases appear to hold that, based on *Gustafson*,

17  § 12 is limited to transactions purchased pursuant to a public offering and, therefore, does not extend

18  to *any* after market transactions.  Although the *Feiner* court's reasoning has some appeal, it appears

19  inconsistent with *dicta* in *Gustafson*.  Notably, the *Gustafson* Court held that "the term 'prospectus'

20  relates to public offerings by issuers and their controlling shareholders" and "was well understood to

21  refer to a document *soliciting the public* to acquire securities *from the issuer*."  513 U.S. at 575-76

22  (emphasis added).  Similarly, the Court has expressed that "[t]he 1933 Act regulates initial

23  distributions of securities, and the 1934 Act for the most part regulates post-distribution trading."

24  *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 171 (1994)

25  (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 752 (1975)).  The court concludes

26  that based on *Gustafson*, § 12(a)(2) does not extend to after market transactions.

27

28  pursuant to a public offering by an issuer and after market (or secondary) transactions.

**C.     Control Person Liability**

Plaintiffs' third and sixth claims allege control person liability against the individual defendants, except Grellman, pursuant to § 15 of the Securities Act premised on the alleged violations of §§ 11 and 12.  Section 15(a) imposes joint and several liability upon every person who controls any person liable under §§ 11 or 12.  *In re Daou*, 411 F.3d at 1029.  The SEC has defined "control" to mean: "[T]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.  As alleged by plaintiffs, defendants are either executive officers and directors of Levi or directors of Levi during the relevant period.  In addition, all defendants signed at least one of the registration statements at issue.  CAC ¶¶ 19-34.  Thus, the court concludes that these individuals are properly alleged to be control persons within the meaning of § 15 by virtue of their positions and role in the registration statements.  *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568 n.4, 1575 (9th Cir. 1990) ("The standards for liability as a controlling person under § 15 are not materially different from the standards for determining controlling person liability under § 20(a). . . . [W]e make clear that in an action based on § 20(a), the defendant who is a controlling person, and not the plaintiff, bears the burden of proof as to defendant's good faith.  Thus, a plaintiff need not make a showing as to defendant's culpable participation; rather, a defendant has the burden of pleading and proving his good faith.").

### III.  EXCHANGE ACT CLAIMS

Plaintiffs' seventh claim alleges a violation of § 10(b) of the Exchange Act against Levi, Marineau, Chiasson, and Grellman.  Plaintiffs' eighth claim alleges control person liability under § 20(a) of the Exchange Act against Marineau, Chiasson, and Grellman.  In order to state a claim under § 10(b) of the Exchange Act and Rule 10b-5, plaintiffs must allege: (1) a misrepresentation or omission of material fact, (2) made with scienter, (3) causation, (4) justifiable reliance by plaintiffs, and (5) proximate causation of the alleged loss.  *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999); *In re Daou*, 411 F.3d at 1014 (citations omitted).  Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the court must determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or with deliberate

1   recklessness made false or misleading statements to investors.  *In re Read-Rite*, 335 F.3d 843, 846

2   (9th Cir. 2003).  The PSLRA mandates that a complaint in private securities fraud litigation plead

3   with particularity both falsity and scienter.  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th

4   Cir. 2002); 15 U.S.C. § 78u-4(b)(1); 15 U.S.C. § 78u-4(b)(2).  If a plaintiff fails to plead either the

5   alleged misleading statements or scienter with particularity, his or her complaint must be dismissed.

6   *America West,* 320 F.3d at 931-32; § 78u-4(b)(3)(A).

7       **A.    Falsity**

8       Defendants first argue that plaintiffs have failed to allege with particularity any facts

9   suggesting that any representations made by Levi or the other defendants were materially false or

10  misleading.  Specifically, defendants contend that plaintiffs' purported allegations of false and

11  misleading statements merely represent the personal disagreement by two former employees of

12  Levi's tax department with various tax positions taken by Levi.  To survive the higher pleading

13  standards required by the PSLRA, the complaint must "specify each statement alleged to have been

14  misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the

15  statement or omission is made on information and belief, the complaint shall state with particularity

16  all facts on which the belief is formed."  15 U.S.C. § 78u-4(b)(1); *In re Daou*, 411 F.3d at 1014

17  (internal quotations and citation omitted).  "It is not sufficient simply to allege that a statement was

18  false." *Ronconi*, 253 F.3d at 431; *see also In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1552

19  (plaintiffs may not "merely proclaim in . . . conclusory fashion that the defendants made false

20  statements").  "When alleging that particular statements were false or misleading, the complaint

21  must make 'specific references to specific facts' as the basis for the falsity allegation." *In re Splash*

22  *Tech. Holdings, Inc. Sec. Litig.*, 160 F.2d 1059, 1072 (N.D. Cal. 2001) (quoting *Wenger v. Lumisys,*

23  *Inc.*, 2 F. Supp. 2d 1231, 1251 (N.D. Cal. 1998)).  "Moreover, the complaint must allege that the

24  'true facts' arose prior to the allegedly misleading statement."  *Splash Tech. Holdings*, 160 F. Supp.

25  2d at 1072 (quoting *Wenger*, 2 F. Supp. 2d at 1250)); *see also GlenFed*, 42 F.3d at 1548.

26      KPMG reaudited Levi's financial statements for 2001, 2002, and the first half of 2003 after it

27  replaced Levi's former auditors.  KPMG audited Levi's 2003 financial statements.  As a result of

28  KPMG's audits, Levi was required to restate its financial statements.  In October 2003 and March

1   2004 Levi announced that it would restate its financial statements for 2001, 2002, and the first two

2   quarters of 2003 in several respects.  Two of the restatements related to tax matters:

3   •       a $24 million increase in tax expense and tax liability in 2001 resulting from a tax deduction

4           taken twice in error for losses related to closures of various plants; and

5   •       a $19 million increase in tax expense in 2001 and 2002 to properly provide for a valuation

6           allowance against deferred tax assets consisting of foreign net operating losses of

7           subsidiaries in a cumulative loss position.

8   To the extent plaintiffs allege that Levi's financial statements were materially false and misleading in

9   these two respects, it cannot be disputed that the financials were misstated as to these two aspects.[20]

10          Nevertheless, the court finds that plaintiffs have failed to allege falsity with sufficient

11  particularity.  As described in §§ I.B.1 through I.B.6 above, plaintiffs' complaint asserts that Levi

12  engaged in six allegedly improper accounting practices that rendered the financial statements and

13  financial disclosures for the relevant period false and misleading.  These are (1) reporting the same

14  tax deduction twice; (2) improperly establishing, maintaining, and releasing excess tax reserves; (3)

15  improperly recognizing unrealizable foreign tax credits as deferred tax assets; (4) improperly

16  claiming bad debt and worthless stock as tax deductions in determining tax expenses to report; (5)

17  failing to properly recognize a tax gain after transferring liabilities to a wholly-owned foreign

18  subsidiary; and (6) improperly understating income tax expense in 2001 and 2002 by not making

19  sufficient provisions for a valuation allowance.  While the court agrees that the complaint goes into

20  detail as to each of these allegedly improper accounting practices, the complaint, taken as a whole,

21  does not give rise to a plausible inference that any particular statement is materially false and

22  misleading on the asserted bases.  The court so concludes for a number of reasons.

23          First, although plaintiffs contend that Levi engaged in the purported accounting

24  improprieties, Levi's audited financial statements and filings with the SEC do not reflect any

25  restatements for these purported improprieties and there is otherwise no indication that the financial

26

27  [20]     However, the court notes that plaintiffs did not allege the financial statements were misstated

28  based on a failure to record a valuation allowance for deferred tax assets consisting of net operating
    losses of foreign subsidiaries in a cumulative loss position.

information is materially false or misleading statements in the manner alleged by plaintiffs.  *See*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007) ("[C]ourts must consider

the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule

12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference,

and matters of which a court may take judicial notice.").  Plaintiffs argue that they have properly

alleged falsity of Levi's financial statements despite the fact that Levi did not restate its financial

statements for each of the alleged accounting improprieties.  Plaintiffs rely upon *Feiner*, 11 F.

Supp.2d at 209, to support their contention.  However, contrary to plaintiffs' contention, *Feiner* did

not involve allegations that the financial statements were misstated; rather, it involved a false

statement in the prospectus describing the issuer's revenue recognition process.  The plaintiffs

alleged that SS&C recognized revenue when a license or service agreement was signed but disclosed

in its prospectus that revenue was recognized only after its obligations to the customer were

substantially satisfied, as required by GAAP.  *Id.* at 208.  Thus, plaintiffs alleged that defendants'

statements in the prospectus falsely described the timing of revenue recognition.  In addressing

whether the alleged false statements were material to plaintiffs, the district court rejected the

defendants' argument that the absence of subsequent restatement or reversal of revenue meant that

plaintiffs' allegations of falsity were immaterial as a matter of law.  *Id.* at 209.  The court reasoned

that the falsity inquiry considers whether the statements were false when made, and SS&C's

statement that it recognized revenue after completion of substantially all customer obligations was

false when made since it recognized revenue upon signing of the agreement.  *Id.*

   *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F.Supp. 1297 (C.D. Cal. 1996), upon

which plaintiffs also rely, is similarly distinguishable.  Specifically, plaintiffs note that the

*Marksman* court stated that "[t]he fact that Chantal's independent auditor may have approved the

accounting methods will not shield Chantal from liability for deception such methods may have

caused."  *Id.* at 1314 n.13.  First, the *Marksman* court applied the pre-PSLRA "motive and

opportunity" test and "conscious misbehavior or recklessness" standard of scienter, both of which

have been rejected by the Ninth Circuit following enactment of the PSLRA.  Second, as to falsity,

the plaintiffs in *Marksman* alleged that Chantal had improperly recognized revenue upon shipment

of products even though the agreement with the distributor permitted, *inter alia*, return of inventory not sold through to end customers and did not require payment until 90 days after shipment to an end customer.  Further, the agreement provided for an option, exercisable by either party, in which Chantal would purchase the distributor for twelve times its earnings value in the preceding three months.  Chantal improperly recognized revenue upon shipment without accounting for the right of return.  Moreover, the terms of the agreement were not disclosed publicly until a later date.  It was later disclosed that Chantal's accounting was probably improper since the products did not appear to transfer to the distributor upon shipment.  Chantal then announced it would hire an independent auditor to review its accounting.  *Id.* at 1303.  Here, unlike in *Markman*, KPMG reaudited the years at issue and issued unqualified opinions.  Although KPMG required Levi to restate its financials, those restatements, as discussed above, do not relate to the type of purportedly improper accounting alleged by plaintiffs.  Unlike in *Markman* where the terms of the sales agreement when compared with the company's actual revenue recognition, demonstrate a violation of GAAP as well as material omissions in the disclosures by the company, there is no corroborative showing to support that the purported accounting practices alleged by plaintiffs resulted in false or misleading financials.

Finally, plaintiffs' reliance upon *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 84 (1st Cir. 2002), is not persuasive.  In *Aldridge*, the court merely held that ""the fact that the financial statements for the year in question were not restated does not end Aldridge's case when he has otherwise met the pleading requirements of the PSLRA."  Thus, the court found that where the pleadings otherwise met the PSLRA standards, defendants could not absolve themselves by pointing to the fact that the financial statements had not been restated.  The court reasoned, "[t]o hold otherwise would shift to accountants the responsibility that belongs to the courts."  *Id.*

Second, the audit committee's investigation, with the assistance of outside counsel, did not reveal material false or misleading statements based on the improprieties pled by plaintiffs.  Although plaintiffs allege that the IRS has opened an investigation into Levi's practices, there are no allegations that the IRS has found any wrongdoing.  Third, as defendants note, after the restatements discussed above, KPMG issued unqualified audit opinions as to the financial statements for 2001, 2002, and 2003.  Plaintiffs do not allege any facts that suggest KPMG's audits were improper,

incomplete, or inaccurate.  Rather, plaintiffs rely almost exclusively on information provided by Schmidt and Walsh to support their assertion that Levi's financial statements are false due to the allegedly improper accounting practices.  Even accepting all of plaintiffs' factual allegations as true, when viewed in light of the entirety of the complaint as well as the matters of which the court has taken judicial notice, the court does not find that these allegations give rise to an inference of falsity. *Compare In re McKesson Sec. Litig.*, 126 F.Supp.2d 1248, 1273 (N.D. Cal. 2000) (holding that plaintiffs adequately alleged "a fraudulent scheme to inflate revenue by recognizing contingent, consignment, or even non-existent transactions as sales where revenues were subsequently restated, the company's investigators concluded that executives intentionally overstated revenue, and there was evidence that executives obscured financial data by segregating side letters from contracts and deleting critical computer files).  Indeed, it is more plausible, as defendants suggest, that Schmidt and Walsh merely disagree with the tax positions taken by Levi.  *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.") (citations omitted); *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.  2002) ("[W]hen determining whether plaintiffs have shown a strong inference of scienter, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs.").

In sum, the court agrees with plaintiffs that the lack of restatement or an unqualified independent auditor's opinion does not absolve or shield a defendant from liability.  However, here, plaintiffs have failed to plead facts suggesting improper accounting other than the views expressed by two former employees.  In light of the unqualified opinions issued after KPMG's audits and the Audit Committee's conclusions that there was no fraud related to Levi's establishment of tax reserves and no material misstatements of tax reserves, the court concludes that the complaint fails to raise a plausible inference that the financial statements were misstated in the manner alleged by plaintiffs.  However, based on Levi's actual restatements, the court finds that plaintiffs have alleged the requisite falsity with respect to the asserted misstatements of financial information based on (1) Levi taking a tax deduction twice in 2001, and (2) Levi understating its valuation allowance in 2001 and

1   2002 for net operating losses of foreign subsidiaries in a cumulative loss position.  The court

2   therefore addresses plaintiffs' allegations of scienter with respect to these alleged false statements.

3       **B.       Scienter**

4           To satisfy the Ninth Circuit standard for scienter, the required state of mind must be

5   deliberate or conscious recklessness.  *In re Daou*, 411 F.3d at 1015.  "[P]laintiffs proceeding under

6   the PSLRA can no longer aver intent in general terms of mere 'motive and opportunity' or

7   'recklessness,' but rather, must state specific facts indicating no less than a degree of recklessness

8   that strongly suggests actual intent."  *Silicon Graphics*, 183 F.3d at 979.  "To meet this pleading

9   requirement, the complaint must contain allegations of specific 'contemporaneous statements or

10  conditions' that demonstrate the defendants knew or were deliberately reckless of the false or

11  misleading nature of the statements when made."  *Ronconi*, 253 F.3d at 432 (citation omitted).  "[I]in

12  determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take

13  into account plausible opposing inferences.  *Tellabs, Inc.*, 127 S. Ct. at 2509; *see also Gompper*, 298

14  F.3d at 897 (same).  "A plaintiff alleging fraud in a § 10(b) action . . . must plead facts rendering an

15  inference of scienter at least as likely as any plausible opposing inference."  *Id.* at 2513.

16          Plaintiffs allege that defendants knew or were deliberately reckless in not knowing that

17  Levi's financial statements did not properly reflect its tax expenses.  Plaintiffs allege that Walsh

18  voiced concern to Liang about a "conduit financing scheme" to improperly recognize unrealizable

19  foreign tax credits as deferred tax assets without a valuation allowance.  CAC ¶ 185.  In May 2002

20  Walsh informed Chiasson that he believed Levi's reported net income was overstated because Levi

21  was fraudulently releasing reserves and recording unrealizable foreign tax credits as deferred tax

22  assets.  *Id.* ¶ 187.  Fong purportedly stated in a meeting that "[w]e are only going to show the

23  auditors what we want them to see."  *Id.* ¶ 186.  Plaintiffs also allege that two KPMG tax partners

24  who questioned the propriety of Levi's use of tax reserves, the failure to establish tax reserves, and

25  the illicit tax schemes were replaced by consultants from Deloitte & Touche who previously were

26  the Arthur Andersen tax partners on Levi's audit account.  *Id.* ¶ 197.  According to the complaint,

27  Walsh testified that while he was at Levi, he discovered that between 1999 and 2001 Levi had

28  improperly released $200 million of unspecified tax reserves, and that Liang and Wong told him the

1  company released reserves to achieve its desired tax rate.  *Id.* ¶ 176.  Plaintiffs also allege that

2  Schmidt testified that in early 2002 he raised concerns of use of improper tax shelters with Liang

3  and Fong who responded by not letting him speak with the IRS.  *Id.* ¶ 178, 194-95.

4          In addition, plaintiffs offer the statements of two confidential witnesses.  One witness

5  worked at Levi from the summer of 2002 to early 2003 and was told not to ask questions or analyze

6  accounts in the consolidated financial reports.  The witness also states that record keeping at Levi

7  was extremely poor or non-existent.  *Id.* ¶ 199.  The second witness worked at Levi from 2000 to

8  2004 as an internal auditor.  This witness claims that Levi sought to have tax and other transactions,

9  such as one involving a subsidiary called Finserv, reviewed by Arthur Andersen with whom it

10  shared a long-standing and close relationship.  This witness further asserts that Levi outsourced the

11  work because the external auditors employed less due diligence.  *Id.* ¶¶ 200-01.

12                    **1.      Taking Tax Deduction Twice in 2001**

13          After considering plaintiffs' scienter allegations and the complaint as a whole, the court does

14  not find that plaintiffs have alleged that Levi acted with scienter when it took a tax deduction twice

15  in 2001 resulting in an understatement of tax expense in its 2001 income statement.  In fact,

16  plaintiffs' allegations more plausibly suggest that Levi recorded the deduction twice inadvertently.

17  For example, plaintiffs allege that after KPMG discovered the double deduction it advised Levi that

18  its global controller's group, corporate controller, and CFO needed to increase their involvement in

19  the review and disclosure of tax items as they relate to GAAP and that it needed to appoint tax

20  personnel with sufficient expertise in tax GAAP issues.  *Id.* ¶ 179-80.  These allegations do not

21  support an inference that the double deduction resulted from scienter on the part of defendants.

22                    **2.      Understatement of Valuation Allowance for Foreign Net Operating
                              Losses**

23

24          As discussed earlier, Levi also restated its 2001 and 2002 valuation allowance to reserve for

25  net operating losses of foreign subsidiaries who were in a cumulative net loss position.  A deferred

   tax asset represents an estimated future tax benefit.  *See* SFAS No. 109, ¶ 8(b).  It may result from

26

27

28

1   temporary timing differences[21] or from carryforwards, such as a net operating loss carryforward.  *Id.*;

2   ¶ 17(c).  Deferred tax assets (and liabilities) are measured as of the date of the financial statements

3   in accounting for income taxes based on the then-applicable tax rates.  *Id.*  However, if available

4   evidence indicates that all or a portion of a deferred tax asset is not expected to be realized, the

5   measurement of the deferred tax asset is reduced accordingly:

> Reduce deferred tax assets by a valuation allowance if, based on the weight of
> available evidence, it is more likely than not (a likelihood of more than 50 percent)
> that some portion or all of the deferred tax assets will not be realized.  The valuation
> allowance should be sufficient to reduce the deferred tax asset to the amount that is
> more likely than not to be realized.

9   *Id.* ¶¶ 8(d), 17(e).  "All available evidence, both positive and negative, should be considered to

10  determine whether, based on the weight of the evidence, a valuation allowance is needed."  *Id.* ¶ 20.

11          KPMG's reaudit of Levi's 2001 and 2002 financial statements revealed that Levi's valuation

12  allowance for deferred tax assets was understated by approximately $19 million in 2001 and 2002.

13  Specifically, Levi did not record a sufficient valuation allowance against deferred tax assets

14  consisting of net operating loss carryforwards for foreign subsidiaries in a cumulative net loss

15  position.  In other words, under SFAS No. 109, KPMG concluded that, based on the available

16  evidence at the time, Levi should have concluded that certain net operating loss carryforwards for its

17  foreign subsidiaries would more likely than not be unrealizable when it issued its financial

18  statements for 2001 and 2002.  "Violations of GAAP standards . . . could provide evidence of

19  scienter."  *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir. 1999).  Nevertheless, although

20  Levi misstated its 2001 and 2002 financial statements by failing to record a proper valuation

21  allowance, it is unclear from plaintiffs' allegations that such failure was intentional or deliberately

22  reckless.  Notably, although plaintiffs point to testimony by Schmidt and Walsh, none of those

23  allegations relates to decisions to understate the valuation allowance for foreign net operating loss

24  carryforwards.  Rather, plaintiffs' allegations relate to purported improper establishing, maintaining,

---

25  [21]    Temporary differences result from differences in how tax laws and financial accounting

26  standards (for financial reporting purposes) differ in recognition and measurement of assets,
    liabilities, equity, revenues, expenses, gains, and losses.  For example, an expense properly reflected

27  on the income statement under financial accounting standards but which is not a current year tax
    expense item results in a deferred tax asset to reflect, on the financial statements, the expected future

28  tax benefit from that expense.  *See* SFAS No. 109 ¶¶ 10-15.

1  and release of excess tax reserves, failure to record valuation allowances for deferred tax assets

2  consisting of foreign tax credits, and engaging in purportedly fraudulent tax shelters and schemes.

3  As such, the court finds that plaintiffs' complaint has failed to allege with particularity a strong

4  showing of scienter with respect to defendants' misstatement of its valuation allowance for foreign

5  net operating loss carryforwards in 2001 and 2002.[22, 23]  *See Tellabs*, 127 S. Ct. at 2510 ("To

6  determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of

7  scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as

8  well as inferences favoring the plaintiff.").

9  **3.      Increase in Valuation Allowance in 2003**

10         Plaintiffs also argue that the significant increase in Levi's valuation allowance in 2003

11  support a conclusion that Levi fraudulently understated its valuation allowance in previous years.

12  The court is unpersuaded.  Plaintiffs allege that Levi increased its deferred tax asset valuation

13  allowance account from $32.7 million at the end of the 2002 fiscal year to $349 million at the end of

14  the 2003 fiscal year.  CAC ¶¶ 42, 53, 63.  Plaintiffs appear to argue that Levi recorded the increase

15  in the valuation allowance in 2003 even though it should have been recorded, at least in part, in

16  earlier years due to misstatements in those prior years.  However, plaintiffs' allegations, viewed in

17  light of the complaint and the additional documents for which the court has taken judicial notice, do

18  not support such a contention.

19  _____

20  [22]      Although plaintiffs allege that defendants were motivated by receipt of stock options based
on Levi's reported profit, *see* CAC ¶ 202, it is undisputed that Levi's stock is not publicly-traded.

21  There are no allegations of insider sales of stock.  Plaintiffs also generally allege that Chiasson and
Fong received substantial bonuses and salary in 2002 and that absent inflated results they would

22  have received lesser bonuses; however, plaintiffs provide no particularized allegations of how the
alleged fraud led to the compensation paid to Chiasson and Fong.  Thus, these allegations are

23  insufficient to support a strong inference of scienter.  Moreover, Fong is not named as a defendant.

24  [23]      Plaintiffs allege that defendants were motivated to commit or deliberately disregard
fraudulent accounting practices because they were highly motivated to raise $1 billion from

25  investors in public offerings.  However, as discussed above, Levi raised capital in private offerings
exempt under Rule 144A.  The subsequent registrations of bonds were in connection with *Exxon*

26  *Capital* exchange offers to enable the holders of unregistered Levi bonds to exchange their bonds for
freely tradeable registered bonds with the exact same terms.  In other words, Levi did not receive

27  any additional capital in connection with the registration of bonds in the April 2001 Offering and the
June 2003 Offering.  Plaintiffs do not appear to allege that there were any false or misleading

28  statements in the Rule 144A offering documents.

ORDER GRANTING IN PART AND DENYING IN PART  MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
C-03-05605 RMW
TNL/SPT                                                34

1    First, the 2003 financial statements, including the need to increase the valuation allowance in

2    2003, was a product of an audit by KPMG in which KPMG issued an unqualified opinion.  Under

3    GAAP, changes in valuation allowances are to be recorded in the period in which the available facts

4    and evidence indicate that it is more likely than not that the associated deferred tax assets will not be

5    realized in future periods; thus, a change in circumstances warranting an increase in the valuation

6    allowance in 2003 would result in an increase in the valuation allowance in 2003.  *See* SFAS No.

7    109 ("The effect of a change in the beginning-of-the-year balance of a valuation allowance that

8    results from a change in circumstances that causes a change in judgment about the realizability of

9    the related deferred tax asset in future years ordinarily shall be included in income from continuing

10   operations.").  Second, while the court agrees with plaintiffs that an independent audit cannot shield

11   a corporate defendant from liability for intentional misstatements, s*ee Marksmen Partners*, 927 F.

12   Supp. at 1314 n.13; *Aldridge*, 284 F.3d at 83, here, plaintiffs have alleged no facts suggesting that

13   KPMG did not perform its audit of Levi's 2003 financial statements properly or issued an

14   unqualified opinion in error.[24, 25]  Plaintiffs' allegation that Fong remarked at a meeting that "[w]e are

15   only going to show the auditors what we want them to see," without more, is insufficient to support

16   an inference that Levi misled KPMG.  Because the court concludes that plaintiffs' allegations are

17   insufficient to show with particularity that defendants acted with scienter as to any material false or

18   misleading statements or omissions, the court dismisses plaintiffs' § 10(b) claim for failure to state a

19   claim.

20          **C.      Control Person Liability**

21          Plaintiffs' eighth claim alleges control person liability against Marineau, Chiasson, and

22   Grellman pursuant to § 20(a) of the Exchange Act premised on the alleged § 10(b) violations.  "In

---

24   [24]    Notably, here, KPMG had notice of the specific allegations made by plaintiffs since they are
largely the same complaints plaintiffs made in their state complaints, which were widely publicized

25   at the time.  Nevertheless, after investigation, KPMG found only accounting errors that largely do
not overlap with plaintiffs' claims.

26   [25]    Plaintiffs note that after KPMG joined as the company's auditors, Levi made three separate
disclosures in September 2003, October 2003 and again in February 2004, and that this requires a

27   conclusion that KPMG was less than thorough in performing its audits.  Opp. at 9-10.  This is at best
a neutral fact for plaintiffs, as multiple restatements also could lead to an inference that KMPG was

28   extremely thorough in its audit of Levi.

ORDER GRANTING IN PART AND DENYING IN PART  MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
C-03-05605 RMW
TNL/SPT                                          35

order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator[.]" *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Because the court concludes that plaintiffs have not alleged that defendants violated § 10(b), plaintiffs' § 20(a) claim also fails.

## IV.  ORDER

For the foregoing reasons, the court (1) DENIES defendants' motion to dismiss plaintiffs' § 11 claims as to those plaintiffs who purchased Levi registered bonds in the after market traceable to the April 2001 or June 2003 registration statements, (2) DENIES defendants' motion to dismiss plaintiffs' § 15 claims, and (3) GRANTS defendants' motion to dismiss as to plaintiffs' other claims with twenty days' leave to amend.

DATED:     9/11/07     

_____
RONALD M. WHYTE
United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiffs:**

| | |
|---|---|
| Robert A. Jigarjian | cand.uscourts@classcounsel.com |
| Robert S. Green | cand.uscourts@classcounsel.com |
| Jill Manning | jmanning@kmslaw.com |
| Alan Schulman | alans@blbglaw.com |
| Robert Gans | robert@blbglaw.com |

**Counsel for Defendants:**

Erin Elizabeth Schneider          eschneider@gibsondunn.com

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Date:** ____9/11/07____                    _____SPT_____
                                              **Chambers of Judge Whyte**